SHERWOOD BROTHERS, INC. *v.* ECKARD, USE OF
SELF AND PENNSYLVANIA THRESHERMEN
& FARMERS' MUTUAL CASUALTY
INSURANCE COMPANY

[No. 136, October Term, 1953.]

486

*Decided May 21, 1954.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*D. Eugene Walsh,* with whom were *George B. P. Ward, Charles O. Fisher* and *Walsh and Fisher,* on the brief, for appellant.

*Wilbur D. Preston, Jr.,* with whom were *David H. Taylor, W. Hamilton Whiteford* and *Due, Nickerson, Whiteford & Taylor,* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

A corporate landlord of a filling station appeals from a judgment on the verdict of a jury, which found it liable to a salesman calling on the tenant and hurt when an automobile, being greased by the tenant, rolled from a hydraulic greasing lift. Suit was brought by the injured man, Richard C. Eckard, the appellee, to his own use and to the use of an insurance carrier, against Roy H. Cutsail, lessee and operator of the station, and the appellant, Sherwood Brothers, the owner and lessor. The jury found a verdict for the lessee.

The filling station consists of the pumps and surrounding area, an office, a storeroom, and the adjoining greasing room, in which the lift was located. Cars were driven onto its two metal tracks and the lift was then raised by hydraulic pressure so that the greasing could be done from beneath. A sign at the entrance to the greasing room read "Danger—Keep Out". Under

the terms of the lease, the tenant had full control of all leased land, buildings, equipment, appliances and other real and personal property, and was solely responsible for maintenance and repairs. A sales agreement, complementary to the lease, required the tenant to sell gasoline, oil and other products of the landlord. Cutsail had operated the filling station for four years before the accident. At the time of the original leasing in 1948, there were no automatic safety devices on the lift to keep cars from rolling off and none were installed. Cutsail used wooden chocks, one at a front wheel and one at a rear wheel, to prevent cars from rolling off. This had been effective, the testimony being that no car had rolled off the lift during Cutsail's tenancy, although it had been in daily operation. The testimony suggested further that in the six years before Cutsail had taken over, no car had rolled from the lift in its constant operation.

In 1952, the appellee came to the station to deliver chains he had previously sold Cutsail. He complained of feeling ill and sat in a chair near the air station outside of the greasing room, at Cutsail's suggestion. In a few minutes, he told Cutsail that he was going to sit in the back of the greasing room in the shade because of the heat of the sun. He testifies that Cutsail, then under the lift, getting ready to grease a car, replied "O. K." While the appellee was sitting in the greasing room, the car rolled off the lift and pinned his right leg to the wall, seriously injuring it. The appellee blames his injury upon the condition of the lift, which he says was defective because it lacked automatic safety devices to prevent cars from rolling off. He finds support for that view in Cutsail's statement to him that the accident occurred because of the lack of safety devices. An official of an engineering company, who for fifteen years had supervised the installation and maintenance of automobile lifts, testified that the manufacturer of the make of lift in question had never manufactured one without an automatic safety device to prevent automobiles

from moving from the lift. No explaination was given by either side as to what happened to the automatic safety devices on the lift, if any ever were on it. It is not claimed that there was any other defect in the lift.

The appellee predicates the liability of the appellant on the theory that the leased premises constituted a place of business to which the general public was invited as patrons, and when leased, had on it unsafe equipment, with the result that the landlord's liability continues despite the lease because he knew of the unsafe condition. To this basic premise, he adds that he was a business visitor at the time of the accident—an invitee of standing equal to that of members of the general public invited to go on the premises for the purchase of gasoline and oil. The appellant made a motion for a directed verdict at the end of the plaintiff's case and renewed it at the end of the whole case. It contended below, as it does here, that the appellee was not an invitee but a bare licensee, and that under the lease, the lessee had full control of the premises and full obligation to maintain the lift in good condition and to repair it if necessary. Further, it urged and urges that a gasoline station is not a public place within the meaning of the cases which have imposed liability on landlords for faulty conditions on premises to which patrons are invited and which they may be expected to visit in large numbers.

The general rule is that the landlord is liable for injuries to persons on leased premises, such as guests or customers of the lessee, only to the same extent as he is to the tenant himself. Accordingly, in the ordinary case, the landlord is not liable for injuries caused by defects existing at the time of the lease except as he may have failed to inform the lessee of defects known to him, and not apparent to the lessee. *Tiffany, Real Property,* 3rd Ed., Vol. 1, Sec. 107; *Smith v. State, Use of Walsh,* 92 Md. 518; *Sezzin v. Stark,* 187 Md. 241, 248. There has been recognized an exception to this rule where the leased premises are to be used for public

or *quasi* public purposes, so that large numbers of patrons may be expected to visit the premises. In such case, the landlord has been held to an obligation to use ordinary diligence to see that the property leased is in a reasonably safe condition at the time of the lease. *Tiffany,* work and section cited. *Restatement, Torts,* Sec. 359, states that where a lessor leases his land for a purpose which involves admission of a large number of persons as patrons of his lessee, he is subject to liability for bodily harm caused to them by an artificial condition existing when the lessee took possession, if the lessor knew or should have known of the condition and realized, or should have realized the unreasonable risk to them involved therein and had reason to expect that the lessee would admit his patrons before the land was put in reasonably safe condition for their reception. The comment points out that liability is limited to patrons who are admitted for the particular purpose for which the land was leased and excludes business invitees on the land for their own purposes. Examples of such leases given are for an exhibition rink, a baseball park, a steamship wharf and a bathing beach.

One of the early cases which involved the exception is *Albert v. State, Use of Ryan,* 66 Md. 325. There, the owner of a wharf, the only means of ingress and egress to a summer resort where crowds were invited to come, leased it to a tenant and at the time knew, or, by the exercise of reasonable diligence, should have known that it was unsafe for the use to which it would be put. An accident happened, as a consequence of the defective condition, to one lawfully on the wharf at the time. The landlord was held liable. The Court relied on *Owings v. Jones,* 9 Md. 108, where a passerby fell into a hole in a public way which the adjoining property owner had protected by an insufficient cover. The Court in that case held: ". . . where the owner leases premises which are a nuisance, or must in the nature of things become so by their user, and receives rent, then, whether in or out of possession, he is liable." Reliance was also

put on *Swords v. Edgar*, 59 N. Y. 28, where the owner of a pier, knowing it to be in an unsafe condition, had leased it. The New York Court held that the pier need not be considered: ". . . a public place or highway in the fullest sense of these terms. . . Though private property, it was held as such for public objects." Later the Court said: "As to the defendants, then, the plaintiff's intestate was lawfully upon the pier, and as to them, it was to him as if a public place or highway, upon which he had right to go, . . ." The New York Court concluded that the pier was a nuisance, the leasing of which gave rise to liability of the owner. This Court, in the *Albert* case, characterized the wharf as a nuisance.

The early cases which either involved or were fairly analogous to nuisances on streets or public ways, led to the exception to the general rule which has been discussed. The cases have applied it most often to places of amusement and hotels. The Courts of the country have divided on the question of a further extension of the exception, often reaching opposite results as to the same type of use. See 93 Univ. of Pa. Law Review, 102, 104. This Court refused to apply the exception in the case of a rooming house. *Smith v. State, Use of Walsh, supra.* There, the Court, in summarizing the applicable law, said that a landlord may be liable to strangers if he rents the property for use of a public character while it is in unsafe condition. Although the public use cases have often characterized the unsafe condition of the premises as a nuisance, and made it the ground of liability of the landlord, the opinion in the *Smith* case seemingly characterized the leasing of a nuisance as an additional liability of the landlord, regardless of the character of the use of the leased premises, because it repeated the language of *Owings v. Jones, supra,* that a landlord may become liable to strangers on leased premises: ". . . which are a nuisance or which must become so by their user . . .", as well as referring to the public use exceptions.

In *Burkert v. Smith,* 201 Md. 452, the Court did not discuss or even refer to the exception, although it held a landlord of premises leased for use as a tavern liable to one injured by a fall down a negligently located flight of stairs. In *Brittain v. Atlantic Refining Co.,* (N. J.) 19 A. 2d 793, where the factual situation was very similar to the present case, the plaintiff urged that the ordinary rule should not apply but rather, the exception, because the service station was designed for public or semi-public use and the landlord must have contemplated that large numbers of people would come upon the premises. The Court held that regardless of the validity of the argument as applied to the filling station as a whole, it could not be sound when applied to the greasing room into which the public were not intended to come and which was not devoted to public use within the meaning of the exception. Consequently, the injury caused by the rolling of a car from the greasing lift could not become the basis of liability on the part of the landlord. See also *Marx v. Standard Oil Co.* (N. J.) 69 A. 2d 748.

We think the holding of the *Brittain* case was sound. The greasing room of a filling station may not be reasonably considered or held to be a place where patrons are invited or in which they may be expected to congregate. At the entrance to the one in this case was the sign "Danger—Keep Out". Assuming, then, for the argument, that the hydraulic lift without automatic safety devices amounted to imperfect equipment, and so to premises not in reasonably safe condition known to be such at the time of the leasing, we hold that the premises on which it was located were not such as would come within the exception, but are to be governed by the general rule. The condition of the lift at the time of the lease, and thereafter, was as fully known to the tenant as it was to the landlord, and this being so, under the general rule, the landlord owed the tenant no duty in respect of it, and as a consequence, owed no duty to an invitee of the tenant. This ruling makes it unnecessary

to pass on the conclusion of the *Restatement* that an injured business invitee may not recover in cases where a patron of a place of public character could.

The appellee urges that the lift at the time it was leased amounted to a nuisance which, under the statement of *Smith v. State, Use of Walsh, supra,* made the landlord responsible to one lawfully on the premises and injured because of it. Traditionally, a nuisance is a thing or condition on the premises, or adjacent to the premises, offensive or harmful to those who are off the premises. The term "nuisance" in cases involving the condition of leased property and its relation to those on the property, is not used with precision in many instances. It has been adopted from cases like those of *Swords v. Edgar* and *Albert v. State,* both *supra,* which followed the rule as to true nuisances on streets or ways, as a convenient term of reference to an unsafe condition. The cases fail often to distinguish between violation of the duty which creates a nuisance and violation of a duty which constitutes negligence. Compare, for example, *Oxford v. Leathe* (Mass.) 43 N. E. 92, where Mr. Justice Holmes, speaking for the Court, referred to various nuisance cases but put the liability of the landlord for a defective condition of the premises causing injury (a horse show rink) on the ground of negligence—foreseeable negligence. A nuisance exists because of a violation of an absolute duty so that it does not rest on the degree of care used but rather on the degree of danger existing with the best of care. Negligence, on the other hand, is the violation of a relative duty for failure to use a degree of care required under particular circumstances. The wharf in the *Albert* case was unsafe and potentially dangerous in the very and only use to which it would be put, regardless of the degree of care used in that use, and so, might properly be termed a nuisance. The lift in the present case was not dangerous or potentially dangerous, unless it was negligently used. It is true that there was testimony that the lessee in the present case used wooden chocks

and that the accident occurred in spite of their use. Nevertheless, it must be obvious that the real and proximate cause of the accident was the lessee's failure either to use blocks of an adequate size or type or to put adequate blocks properly and securely in place. The advantage of automatic safety devices over movable blocks is that the operator occasoinally may fail to block the car while the automatic device presumably would not, or at least, not as often. This cannot constitute a basis for holding the landlord liable. It would be hardly contended that an elevator with automatic doors which were not working but which could readily be opened and closed manually, was a nuisance because injury ensued when an experienced operator forgot to properly close the door. In other words, the lift in this case was not then, properly used, any more potentially dangerous than if it had been equipped with the safety device, and cannot be held to be a nuisance. As the New York Court said in *Swords v. Edgar, supra*: "A lessor of premises, not *per se* a nuisance, but which becomes so only by the manner in which they are used by the lessee, is not liable therefor. . . But that rule may not apply here. A pier so defective and insecure when it is leased, as that a subsequent injury, received in the proper use of it as if sound, is consequent upon its original condition, is, for the purposes of such an action as this, *per se* a nuisance. Its effect upon third parties is not the result of the manner of the use of it by the lessee." In *Whitmore v. Orono Pulp & Paper Co.* (Me.) 39 A. 1032, a pulp mill operated by a lessee, contained a digester, a large cylinder of deoxidized bronze, which exploded as a result of its inability to resist the usual pressure of steam used. It was urged that the digester, in its defective condition, constituted a nuisance. The Court held that: "To constitute any particular thing a legal nuisance *per se* (apart from statute nuisances), as between lessor and lessee and the servants of the lessee, the thing itself must work some unlawful peril to health or safety of person or property,—as defective

cesspools, imperfect sewers and drains, walls and chimneys liable to fall, unguarded excavations, etc. A fixed, inert mass of metal, upon a solid foundation upon one's own land, like this digester, was not in itself dangerous to any one. . . The danger arose only when the lessee, the employer, began to make use of the digester without first ascertaining its tensile strength, and gauging the applied force accordingly."

We think the reasoning expressed by the last two quotations is applicable to the case before us. The real danger in the lift was not in its failure to have safety bars when it was leased, but rather, the manner of its use by the tenant. We find no liability on the part of the landlord and the appellant's prayer for a directed verdict should have been granted.

*Judgment reversed, with costs.*